**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** **PLAINTIFF**

**V.** **CASE NO. 5:23-CV-05149**

**WALMART, INC. and WALMART STORES ARKANSAS, LLC** **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Now before the Court are Defendants Walmart, Inc. and Walmart Stores Arkansas, LLC's Motions for Partial Summary Judgment (Doc. 95) and to Bifurcate Consideration of Punitive Damages (Doc. 117), which Plaintiff Equal Employment Opportunity Commission ("EEOC") opposes.[1] EEOC brings this action under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA"), alleging that Walmart, Inc. and Walmart Stores, Arkansas, LLC subjected Glenda Scott, Jaclyn Walker, and a class of former employees to an unlawful qualification standard known as the Pathways Graduation Assessment. For the reasons that follow, the Motion for Partial Summary Judgment (Doc. 95) is **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART**; and the Motion to Bifurcate Consideration of Punitive Damages (Doc. 117) is **DENIED**.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165

[1] The Court has also reviewed the parties' statements of fact (Docs. 97 & 109), various briefs in support or opposition (Docs. 96, 104, 109, 110, 114, 118 & 156), and attached documents.

F.3d 602, 606 (8th Cir. 1999) (quoting Fed. R. Civ. P. 56). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

"To be material, a fact must 'affect the outcome of the suit under the governing law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient' to survive summary judgment." *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby*, 477 U.S. at 252). The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Court must base its determination of whether a genuine issue of material fact exists on "evidence that will be admissible at trial. [T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (alteration in original) (internal quotations and citations omitted). The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d

1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Liberty Lobby*, 477 U.S. at 251.

## II. FACTUAL BACKGROUND

EEOC disputes several material facts listed in Walmart's Statement of Facts (Doc. 97). The Eighth Circuit has repeatedly stated that "in opposing a motion for summary judgment, a nonmoving party may not rely on mere denials or allegations in its pleadings, but must designate specific facts showing that there is a genuine issue for trial." *Hernandez v. Jarman*, 340 F.3d 617, 622 (8th Cir. 2003). Some of EEOC's denials rely on inadmissible hearsay for which EEOC has offered no exception. Unless indicated otherwise, the following facts are found to be uncontroverted based on EEOC's admissions or failure to present contradictory evidence that could be offered in an admissible form at trial.

### A. Walmart and the Pathways Graduation Assessment

Walmart is one of the largest retailers in the world, employing over 1.5 million "associates" nationwide across thousands of stores. (Doc. 109, p. 1). Starting in 2016, Walmart began requiring all entry-level, hourly associates hired to full- or part-time positions at Walmart Supercenters and Neighborhood Markets nationwide to complete a training program called "Pathways." (Doc. 95-7, pp. 12:8–14:6 (Allen Dep.); Doc. 110-9,

p. 4).[2] Associates in approximately thirty-two different job titles were required to participate in the training program. (Doc. 110-12, p. 20).

Pathways was a hybrid, interactive training program that consisted of a computer-based component and an in-person component. (Doc. 95-7, pp. 10:17–22 (Allen Dep.)). The computer-based learning modules were accessed on a "training system known as the Pathways Portal," and the in-person component consisted of on-the-floor training and check-in meetings called "Touch Bases," where associates would receive feedback from hourly supervisors and other management personnel as they progressed through the training program. (Doc. 110-9, p. 4; Doc. 95-1, pp. 5, 10). Multiple iterations of the Pathways Implementation Guide indicate that the individual Store Managers "own[ed] the implementation and progress of Pathways in [their] store[s]" and were responsible for "set[ting] expectations" and "driv[ing] participation." (Doc. 110-9, p. 12); *see also* Doc. 95-1, p. 16.

In general, the Pathways program was divided into four main phases: (1) "Welcome to Walmart"; (2) "Work Skills 1"; (3) "Work Skills 2"; and (4) "Graduation." (Doc. 95-1, pp. 4, 10; Doc. 110-9, p. 8). Each phase had a timeframe that coincided with different employment benchmarks. For example, the "Welcome to Walmart" phase took place on the first day of employment when newly hired associates would go through orientation, learn about the Pathways training program, and get introduced to their store's management team. (Doc. 95-1, p. 4; Doc. 110-9, p. 6). Next, associates would complete the "Work Skills 1" phase during their first five shifts, which consisted of a combination of

[2] Transcript citations refer to the transcript pages. All other citations refer to the ECF pages.

computer-based modules—videos, games, and quizzes—and on-the-floor trainings specific to their store and role. (Doc. 95-1, pp. 18–19; Doc. 110-9, pp. 6, 14–15).

Associates would then move on to “Work Skills 2,” which would take a minimum of 5 months to complete. (Doc. 95-1, p. 4; Doc. 110-9, p. 6). This phase required associates to complete “three modules” comprised of “a combination of videos, on-the-floor training, and observation that focus[ed] on the fundamentals of customer service, inventory management and merchandising skills.” (Doc. 95-1, p. 22; Doc. 110-9, p. 18). At the conclusion of each module, an hourly supervisor would hold a Touch Base with the associate “to provide feedback and encouragement” based on the performance observations. (Doc. 95-1, p. 23; Doc. 110-9, p. 19). After the Touch Base, the associate would take “an assessment on the Work Skills 2 module to identify areas of strength and opportunity.” *Id.* According to the May and June 2016 Pathways Implementation Guides, associates had the ability to review any training module and assessment that they completed, and “[a] list of skills and behaviors from each module that the associate should be incorporating into their daily routine” was accessible “via the Portal or ‘Quick Reference’ tab in the Pathways Toolkit.” *Id.* Once an associate finished all three modules in Work Skills 2, they could begin the Graduation phase. (Doc. 95-1, p. 4; Doc. 110-9, p. 6).

“Graduation of Pathways [was] a requirement for continued employment” and was the final step in the Pathways program. (Doc. 95-1, pp. 4, 27). To complete the Graduation phase, associates had to pass three “qualifiers”: the Attendance Check, the Performance Sign Off, and the Graduation Assessment. (Doc. 95-1, p. 27; Doc. 110-9, p. 22). “Failing any of the 3 qualifiers [would] result in termination.” (Doc. 110-9, p. 5). The parties dispute

the length of time associates were given to complete the requirements of the Graduation phase. (Doc. 109, pp. 3–4); *see generally* Doc. 110-12, p. 5 (Validation Report stating the Graduation Assessment "was designed to be given to incumbents who had been in role for 30–60 days"); Doc. 110-9, pp. 4–5 (Pathways May 2016 Implementation Guide stating that associates "will be required to complete Pathways within 18 months of their hire date" and "[f]ailure to complete Pathways within 18 months . . . will result in the Associate's termination"); Doc. 95-1, p. 4 (Pathways July 2016 Implementation Guide stating associates "have up to 18 months to graduate").

The first qualifier was the Attendance Check—an "[a]utomatic system check . . . to determine if the associate [was] in compliance with the Attendance Policy." (Doc. 95-1, p. 29; Doc. 110-9, p. 23). "If the associate passe[d] the Attendance Check, the next step of Graduation [would] be unlocked." *Id.* However, "not passing the Attendance Check [would] result in the associate's termination using termination code 47-2 (excessive absence/tardiness)." *Id.*

The second qualifier, the Performance Sign Off, was a "performance rating completed by the hourly supervisor and assistant manager in the portal after the Attendance Check." (Doc. 95-1, pp. 34, 42–43; Doc. 110-9, p. 24). The hourly supervisor would rate the associate on meeting performance expectations in four categories—customer service, communication and teamwork, essentials of retail, and essentials of marketing—which the assistant manager would subsequently review. *Id.* Either the hourly supervisor or the assistant manager would then discuss the results with the associate and provide feedback. *Id.* If the associate passed the Performance Sign Off, they would progress to the last qualifier. If not, the assistant manager and hourly supervisor had to

"terminate the associate within 7 days using the termination code UNS-2 (Unsatisfactory performance)." *Id.*

The third and final qualifier was a multiple-choice test called the Pathways Graduation Assessment ("PGA"). (Doc. 95-1, p. 44; Doc. 110-9, p. 25). The PGA was administered on the computer via the Portal and based on the training and assessments from Work Skills 2. *Id.* Associates were given three attempts to achieve a passing score on the PGA. *Id.* According to the Pathways Implementation Guides, if an associate failed on the first or second attempt, they would have to wait one week before they could retake the exam. *Id.* Failure on the third attempt would require the assistant manager and hourly supervisor to "terminate the associate within 7 days using termination code UNS-2 (unsatisfactory performance)." *Id.* Walmart voluntarily discontinued the PGA in March 2020. (Doc. 109, p. 4).

Walmart had several accommodation policies in place during the time it enforced the Pathways training program. *See* Docs. 95-4 (Accommodation in Employment Policy), 95-5 (Accommodations and Pathways), and 95-6 (Accommodation in Management Guidelines). However, the parties dispute the extent to which the policies were "implemented, used, and adhered to" by Walmart and its management teams at different stores. (Doc. 109, pp. 4–5).

The Pathways Accommodation Policy acknowledged that "a disability or other medical condition" could make it difficult for an associate to complete the Pathways training and, "because not all disabilities are visible or apparent," it directed managerial personnel to "ensure that all associates understand that [Walmart] can provide reasonable accommodations." (Doc. 95-5, p. 2). Likewise, the Pathways Implementation

Guides for May and July 2016 contain several footnoted disclaimers regarding accommodations. *See* Doc. 110-9, pp. 4, 6, 14, 18, 22 ("NOTE: Ensure associates that have a medical condition or disability, and need help, have been given an opportunity to either receive a Job Adjustment or submit an accommodation request.") (Pathways May 2016 Implementation Guide); Doc. 95-1, pp. 18, 21, 27 ("NOTE: Ensure that associates who have a medical condition or disability and need help with the Pathways training or [PGA] have been given an opportunity to request a job adjustment or accommodation through the Accommodation Service Center.") (Pathways July 2016 Implementation Guide).

The Pathways Accommodation Policy outlined a three-step process for when an associate was observed to be "having difficulty completing Pathways, or if [the] associate indicate[d] that he or she need[ed] assistance, due to a disability or medical condition." (Doc. 95-5, p. 2). Additionally, Walmart's Accommodation in Employment Policy and Management Guidelines permitted requests for a job adjustment or a reasonable accommodation by a family member, a friend, a job coach, or a health care professional on behalf of an associate. (Doc. 95-4, p. 2; Doc. 95-6, p. 1).

The first step directed the manager, personnel, or training coordinator to "discuss the associate's needs with the associate" and "identify what sort of help the associate needs to complete the training or test." *Id.* The next step instructed the store manager to "approve a job adjustment to meet the associate's needs" so long as the assistance did not "change the training or give the associates answers to the tests." *Id.* Step two included a list of pre-approved job adjustments that could be provided to associates for the Pathways program and PGA. *Id.* For example, managers, personnel, or training

coordinators could "read aloud the questions or choices," "pronounce or clarify the meaning of a word," "remind the associate about a real-life example," "allow frequent breaks," "remove distractions . . . from the testing room," allow the "use of ear plugs or amplification device[s]," "enlarge the text on the computer screen," "turn off any timers in the training and remind associates that tests are not timed," and "allow job coach, if requested." *Id.* In the event that an associate's needs could not be met through a job adjustment, step three stated that "the associate should submit a request to the Accommodation Service Center" which may not require "additional medical documentation . . . if the associate's condition is obvious or generally known." *Id.* Under the Pathways Accommodation Policy, no manager, personnel, or training coordinator was allowed to "deny a request for accommodation without getting approval from the Accommodation Service Center." *Id.*

Walmart asserts that it "made the PGA accessible" by providing "guidance to managers" regarding "job adjustments" that could be given for the PGA and by "including repeated written, aural, and on-screen pop-up notifications directing associates who need help because of a disability or medical condition to contact a manager or Personnel Coordinator." (Doc. 97, p. 2). Walmart also claims that the Pathways training modules and the PGA had closed-captioning. *Id.* Although EEOC does not dispute the existence of Walmart's Pathways Accommodation Policy, EEOC contests that "management teams at local stores implemented, used, and adhered to the Pathways Accommodation Policy." *Id.* EEOC disputes that the PGA had closed-captioning and disputes that the closed-captions for the Pathways computer-based modules launched automatically. (Doc. 109, p. 5).

Finally, Walmart maintains that it "has no intention of reinstating the PGA or any materially similar test required to maintain employment." (Doc. 97, p. 2; Doc. 95-3 ¶¶ 7–8 (Allen Decl.)). However, EEOC challenges this contention by pointing to testimony from Ashley Curtis, a "Market People Partner" for Walmart. (Doc. 109-29, pp. 48:21–49:6 (Curtis Dep.)). Team members at the Market level oversee approximately nine to twelve store locations. *Id.* at 46:5–7. Among other things, Curtis's job entails monitoring the progress towards "compliance trainings," "badging . . . training," and trainings on the ULearn system that associates working at stores within her Market are required to complete. *Id.* at 53:17–54:8, 56:3–57:10–23. The ULearn training system includes certain tests and training that the associates must complete. *Id.* at 58:15–23, 60:1–10. According to Curtis, if an associate is not completing or earning a passing score on certain required ULearn trainings, she will consult "the accountability matrix" to determine if further action is necessary. *Id.* at 61:11–23. The accountability matrix is "a set of guidelines" that proscribes specific courses of action, including "termination actions," available in response to "associates and things that they do that impact compliance and safety." *Id.* at 61:11–62:4. In EEOC's view, the fact that termination is a potential consequence for associates failing to complete ULearn training on compliance and safety contradicts Walmart's claim that it has no intention of reinstating any test required to maintain employment that is materially similar to the PGA. (Doc. 109, p. 4).

**B. EEOC's Investigation**

Former Walmart employees began filing charges with EEOC with regard to the PGA as early as June 8, 2018. (Doc. 110-1, p.1). On November 20, 2018, Glenda Scott filed a charge of employment discrimination with EEOC regarding Pathways and her

termination from Walmart. (Doc. 110-2). EEOC opened an investigation and notified Walmart of the charge on November 29, 2018. (Doc. 95-8). On December 18, 2018, Jaclyn Walker also filed a charge of employment discrimination with EEOC against Walmart, (Doc. 110-3), and EEOC notified Walmart of the charge on December 19, 2018, (Doc. 95-9).

EEOC submitted multiple requests for information, to which Walmart responded, starting in June 2019 and continuing through July 2021. (Doc. 95-10, p. 1). On July 27, 2021, EEOC notified Walmart that it intended to investigate a nationwide class related to discrimination via the PGA. *Id.* EEOC notified Walmart on July 8, 2022, through Letters of Determination, that EEOC found it reasonable to believe that Walmart had violated the ADA with respect to Scott and Walker as well as a class of aggrieved individuals, inviting conciliation which was conducted but was unsuccessful as of August 12, 2022. (Doc. 58, p. 1 n.1).

EEOC initiated this action on September 11, 2023, on behalf of the two Charging Parties—Ms. Scott and Ms. Walker—and eleven opt-in Claimants: Sonya Allen, Tiayla Butler, Mercedes Cannady, Timothy Grable, Johnny Gray, Brynne McFall, Tamra Norrod, Chriss Ouellette, Ernest Smith, Sr., Dakari Williams, and Heaven Wright.

### C. Charging Parties

#### ***1. Jaclyn Walker***

Walmart hired Jaclyn Walker as an evening-shift shelf stocker in November 2017. (Doc. 109, p. 8; Doc. 95-14, pp. 45:14–18, 60:21–62:14 (Walker Dep.)). Ms. Walker has a “learning/speech disability” for which she received accommodations and treatment while in school. (Doc. 95-14, pp. 123:24–124:16 (Walker Dep.)). Ms. Walker’s disability

causes her to have difficulty comprehending conversations and remembering or understanding things. *Id.* at 154:18–155:1. Ms. Walker's father, Billy Walker, testified that she had an Individualized Education Plan ("IEP") throughout her schooling and that she did not know how to count money. (Doc. 109-18, pp. 42:1–43:7 (Billy Dep.)).

On June 25, 2018, Wynne Katzer—the store manager of the Walmart location Ms. Walker was employed at—emailed Shenan Boit—an associate regulations team member at Walmart's home office—after having a conversation with Billy Walker and Ms. Walker regarding Ms. Walker's learning disability. *Id.* at 25:17–22, 66:5–19, 67:18–68:15, 69:15–70:20, 99:4–100:6. Katzer told Boit that she had "an associate, Jaclyn Walker, who is pending an exit review on pathways.[ ]She has a learning disability and we did not make an accommodation on her graduation attempts. How can I make the accommodation for her and get her out of exit review?", to which Boit responded by telling Katzer to submit a form to "the Pathways Exception Inbox" where "legal (or someone) will review and grant a Pathways redo or not." (Doc. 110-7). According to Katzer, she did not recall receiving any information or training on the Pathways Exception Inbox and did not know what it was. (Doc. 109-27, p. 100:7–20 (Katzer Dep.)).

After filling out the form, Katzer was informed "that an exception would not be granted" for Ms. Walker. *Id.* at 100:21–101:18. Katzer subsequently terminated Ms. Walker in August 2018 for "[f]ailure of the Pathways Graduation Assessment" after taking it three times. *Id.* at 68:5–8, 77:12–78:8; Doc. 95-14, 84:1–19 (Walker Dep.).

***2. Glenda Scott***

Glenda Scott is a deaf individual who communicates primarily in American Sign Language ("ASL"), although she has the ability to read and write in English. (Doc. 109, p.

10). Ms. Scott was first hired at a Walmart store in Pine Bluff, where she worked from January 2015 to August 2016. (Doc. 95-16, 51:5–22 (Scott Dep.)). Ms. Scott completed the Pathways training at the Pine Bluff store with the assistance of Pamela, an instructor that Ms. Scott would write back and forth with. *Id.* at 68:10–69:2, 87:15–88:1. Pamela and Ms. Scott attempted to turn on closed captioning for the Pathways computer-based training modules, but Ms. Scott testified that their attempts were unsuccessful and that no closed captioning was provided to Ms. Scott on the Pathways training in Pine Bluff. *Id.* at 88:2–25. However, Ms. Scott was able to pass the PGA with Pamela's assistance. *Id.* at 142:2–143:5. Ms. Scott ultimately left her employment at the Walmart in Pine Bluff to attend school full-time at Pulaski Technical College ("PTC") in North Little Rock, Arkansas. *Id.* at 51:23–52:5.

While in school at PTC, Ms. Scott began working at a Walmart store in North Little Rock in 2018. *Id.* at 52:15–53:4. Ms. Scott was again required to complete the Pathways training at the North Little Rock store. *Id.* at 89:1–3. This time, however, Ms. Scott did not receive assistance with the computer-based training or PGA, despite having asked Darrell Lord—the assistant store manager—for an ASL interpreter. *Id.* at 89:24–92:13; (Doc. 109-28, 10:13–11:3 (Lord Dep.); Doc. 109, p. 10). Ms. Scott testified that, without assistance or closed captioning, she could not understand the Pathways training. (Doc. 95-16, 94:23–95:25 (Scott Dep.)). EEOC disputes the fact that the PGA prompted Ms. Scott to request an accommodation. (Doc. 109, pp. 11–12). Ms. Scott failed the PGA three times in May 2018 and was terminated in August 2018. *Id.*

### D. Claimants

#### *1. Mercedes Cannady*

Mercedes Cannady worked as a cashier at a Walmart store in Wisconsin for three months in 2019. (Doc. 109, p. 12; Doc. 95-18, 40:19–21, 45:3–5 (Cannady Dep.)). Over the course of her employment, "Ms. Cannady received 'occurrences' (attendance-related points) for arriving late to her scheduled shift eight times and missing a shift entirely without notifying Walmart." (Doc. 109, p. 12; Doc. 95-19).

Ms. Cannady has a learning disability for which she received accommodations in school under an IEP. (Doc. 95-18, 61:2–9, 64:13–65:4, 84:11–22 (Cannady Dep.)). Ms. Cannady was accompanied by a member of her care team—a coach provided by the State of Wisconsin—during her shifts at Walmart. *Id.* at 65:5–25, 66: 3–10. The care team coach attended orientation with Ms. Cannady and would stay with her at the cashier post during her shift. *Id.* at 68:12–19, 69:13–21.

Ms. Cannady took the PGA one time in October 2019. (Doc. 109, p.12). Ms. Cannady took the PGA alone, as her care team coach was scheduled elsewhere on the day she was directed to take the assessment. (Doc. 95-18, 66:21–67:24 (Cannady Dep.)). Ms. Cannady testified that she was surprised by the test and that she had difficulty understanding the questions and answers. *Id.* at 78:3–79:17, 84:3–10. According to Ms. Cannady, she requested help on the PGA, but she did not receive any assistance. *Id.* at 76:22–77:23, 79:1–19. Ms. Cannady testified that she told the person administering her exam about her disability and requested someone to read the questions aloud to help her understand the test, but she did not receive any assistance. (Doc. 109-8, p. 79:1–19

(Cannady Dep.)). Ms. Cannady was terminated one week after she took the PGA. (Doc. 109, p. 13).

### *2. Johnny Gray*

In November 2016, Johnny Gray began working as a maintenance associate at a Walmart store in Keyser, West Virginia. (Doc. 95-21, pp. 77:24–26, 81:7–16, 86:16–23, 91:17–19, 99:10–15 (Gray Dep.)). Mr. Gray was born deaf and communicates solely through ASL. *Id.* at 33:7–15, 35:23–36:7. Mr. Gray testified that during orientation, he notified Walmart through an ASL interpreter that he would need "interpreting services [and] video remote interpreting" ("VRI") to assist him during meetings and discussions with his supervisors. *Id.* at 81:10–20, 82:18–20, 89:26. However, Mr. Gray stated that Walmart did not provide live interpreters for meetings or discussions with his supervisor and that the VRI system was inconsistently used. *Id.* at 83:18–84:2.

Mr. Gray testified that he first learned about Pathways in 2017 when he had a meeting with someone in the personnel office. *Id.* at 90:8–22. According to Mr. Gray, that was the first time he was shown the Pathways website and taught how to navigate the Portal interface. *Id.* at 91:3–16. Then in March 2017, Mr. Gray took the PGA twice on the same day. *Id.* at 112:0–11, 116:15–18. Mr. Gray testified that, after he failed the PGA the first time, he asked for help from the person who was proctoring his exam, but the Walmart employee working in the personnel office that day informed him that he would "have to do it" himself. *Id.* at 112:14–20, 114:6–16. Mr. Gray was terminated shortly after failing his second attempt at the PGA. *Id.* at 112:9–20, 116:15–21, 119:2–11.

Mr. Gray later contacted vocational rehabilitation services about his termination. *Id.* at 109:17–110:8. After vocational rehabilitation intervened, Walmart allowed Mr. Gray

to retake the PGA with the assistance of Ed Meyer, the vocational rehabilitation personnel who accompanied Mr. Gray to Walmart to discuss his termination for failing the PGA. *Id.* at 110:9–23, 120:2–17, 121:4–122:4. Mr. Gray passed his third attempt at the PGA with Mr. Meyer's assistance and was permitted to return to work at Walmart. *Id.* at 110:9–23, 120:2–17, 121:4–122:4. The parties dispute the length of time that elapsed between Mr. Gray's discharge and his subsequent return to work. (Doc. 109, p. 15). Walmart contends that Mr. Gray "returned to work one week later," but Mr. Gray testified that he did not "know exactly, but [he] would say roughly about one or two weeks." *(*Doc. 95-21, p. 122:5–10 (Gray Dep.)).

Upon his return to the Keyser Walmart, Mr. Gray had a meeting with his supervisor, Mary Bowman, to discuss accommodation options regarding communicating with managers or coworkers. *Id.* at 101:12–102:17. In response, Walmart provided Mr. Gray a phone to carry during his shifts so that he could use it to text his supervisors. *Id.* However, Mr. Gray testified that he eventually stopped getting the phone from storage at the start of his shifts because he "notice[d] that the supervisors were not picking up their phone" and would often forget to have it on them. *Id.* at 103:18–104:21. When Mr. Gray transferred to another Walmart location, he suggested implementing the phone system, as "it had been easier at the Keyser store to communicate" that way, rather than relying on the interpreter or VRI system. *Id.* at 106:2–13. Mr. Gray testified that, at first, the store manager at the Cross Lanes Walmart did not think the phone system was necessary, but after Mr. Gray made "an ADA complaint," the Cross Lanes Walmart provided him a phone for communication purposes. *Id.*

### *3. Brynne McFall*

Brynne McFall testified that she was born "completely deaf" and uses ASL as her first language but can read and write in English as a second language. (Doc. 95-22, pp. 11:23–13:4, 74:21–24 (McFall Dep.)). During high school, Ms. McFall had an ASL interpreter attend classes with her. *Id.* at 14:17–15:7.

In October 2016, Ms. McFall began working part-time as a shelf stocker at a Walmart store in Shelbyville, Indiana. *Id.* at 26:15–20. On average, Ms. McFall worked around twenty hours per week. *Id.* at 41:9–19. Ms. McFall testified that Walmart did not provide her with an ASL interpreter at orientation, on the PGA, nor to aid her in participating in meetings. *Id.* at 73:21–75:19. Ms. McFall worked for Walmart from October 2016 until June 2017, when she was terminated for failing the PGA three times. *Id.* at 28:18–20, 37:25–38:4, 46:3–7, 47:24–48:4. Prior to her termination, Ms. McFall received good feedback on her performance. *Id.* at 65:12–25, 72:1–3. Scott Kord, the assistant manager who supervised Ms. McFall, testified that "she was a good associate. She was very reliable and was very willing to take on new tasks and did well in the role that she was in." (Doc. 109-10, p. 46:10–13 (Kord Dep.)).

Walmart asserts that Ms. McFall "admitted her deafness was not the reason she failed" the PGA. (Doc. 97, p. 6). Walmart points to an answer in Ms. McFall's deposition testimony, where she responded "no" to a single question asking if she believed "being deaf [was] a reason that [she] did not pass the PGA tests." (Doc. 95-22, p. 64:16–18. (McFall Dep.)). EEOC disputes the accuracy of Walmart's interpretation of the testimony and highlights its inconsistency with Ms. McFall's other responses discussing her deafness and need for accommodation. (Doc. 109, pp. 15–16); *see* Doc. 95-22, p. 9:19–

21, 9:24–10:6 (McFall Dep.) ("Q: Can you please describe for me the reason that you are a participant in this lawsuit? A: For the tests that I have taken, I failed, and it was because I did not have accommodation." McFall goes on to describe her desired accommodation: "A: So the accommodation was for me to be able to have the exam or test translated in American Sign Language. Typically what would happen is that a staff person would have an interpreter for that.").

Indeed, Walmart's assertion is difficult to square with the undisputed evidence that ASL is Ms. McFall's first language, that she failed the PGA the three times she took it without accommodation, and that she passed the exam on her fourth attempt when a coworker assisted her "by explaining what certain questions meant." (Doc. 97, p. 7; Doc. 109, p. 17). It is even more difficult to square with the rest of Ms. McFall's testimony, when taken in its entirety:

> Q: Why did you decide to participate in this lawsuit?
>
> A: Because I felt it was not fair for deaf people. They should have accommodations to take tests.
>
> Q: And what accommodations do you think are necessary to take tests at Walmart on the computer?
>
> A: An American Sign Language Interpreter
>
> . . .
>
> Q: Thinking back to that PGA test, how would an American Sign Language interpreter have participated?
>
> A: For example, if I don't understand a sentence, I would ask the interpreter to please use American Sign Language and interpret what the English sentence states so I can understand it clearly.
>
> Q: Do you believe, Ms. McFall, Walmart discriminated against you because you are deaf?
>
> A: People were friendly, but discrimination for the test, possibly.

> Q: And tell me why you think possibly, in terms of the test, there could have been discrimination because you were deaf?
>
> A: Because being a deaf person, it's hard to read and understand English sentences. It's not my first language. I had no one to help me understand.
>
> . . .
>
> Q: I want to talk now, go back to the PGA and your deafness. Why do you believe you failed the first, second, and third tests?
>
> A: The reason why is because I didn't understand the English sentences that was there, and I couldn't figure out what it meant. So I just kind of guessed and picked an answer, and I just was wrong, so I didn't pass.

(Doc. 95-22, 73:21–74:1, 74:7–24, 90:21–91:3 (McFall Dep.)).

In July 2017, one month after her termination, Ms. McFall was contacted by the store manager and was asked to come back to her job at Walmart. (Doc. 95-22, p. 42:16–20 (McFall Dep.)). Walmart rehired Ms. McFall to her former position and told her that she could retake the PGA. *Id.* at 43:23–44:9, 51:2–8. Ms. McFall passed the PGA on her fourth attempt, when she received assistance from a coworker who helped explain questions that she had difficulty understanding. *Id.* at 49:7–50:3, 50:13–18. Upon her return, Ms. McFall continued to work at Walmart until September 2020, when she voluntarily resigned. (Doc. 95-22, p. 33:11–16 (McFall Dep.)).

#### ***4. Tiayla Butler***

In 2018, Tiayla Butler was hired to work as a part-time cashier at a Walmart store in Hot Springs Village, Arkansas. (Doc. 95-23, pp. 23:21–23, 26:4–8 (Butler Dep.)). Ms. Butler testified that she has a learning disability. *Id.* at 10:10–17. While in school, Ms. Butler had an IEP and testing accommodations, including extended time and the elimination of an answer choice on multiple-choice exams. *Id.* at 11:1–17, 13:10–19, 14:9–22.

Ms. Butler testified that after she failed her first attempt at the PGA, she provided Walmart with documentation of her disability and asked for an accommodation on the PGA. *Id.* at 34:16–35:5, 51:25–52:7. Walmart contends that Ms. Butler requested that "the least likely answer choice" be removed from her exam, while EEOC argues that Ms. Butler merely asked for the removal of "any one answer choice, not the least likely answer." (Doc. 109, p. 18). Either way, Ms. Butler testified that Walmart declined to alter the exam and would only assist her by reading the questions out loud. (Doc. 95-23, p. 34:21–35:10, 52:12–16, 81:17–82:9 (Butler Dep.)). On her second attempt, Ms. Butler received assistance from her manager who read the questions aloud to her. *Id.* at 52:17–53:10. Despite the assistance, she failed the second attempt at the PGA. *Id.* at 53:11–17.

Walmart contends that Ms. Butler received the same assistance on her third attempt as well, but EEOC disputes this and points out that Ms. Butler testified that she could not remember if she received assistance on her third attempt. (Doc. 209, p. 18). Ms. Butler testified that, even after she failed her second attempt at the PGA, Walmart did not discuss with her the possibility of providing any other type of accommodation nor inform her that she could appeal the denial of her requested assistance. (Doc. 95-23, p. 110:13–111:14 (Butler Dep.)). Ms. Butler failed her third attempt at the PGA and was subsequently terminated. *Id.* at 19–5. Ms. Butler testified that, when her managers informed her that she was being terminated, she felt "humiliated" and began to cry and has trouble remembering the rest of the conversation because she became "too emotional to talk." *Id.* at 72:22–15, 112:6–8. Ms. Butler stated that she believed that she could perform her job even though she could not pass the PGA, and she believed that

she could have passed the PGA had she been given the accommodation she requested or more opportunities to take it. *Id.* at 81:17–9, 83:3–9, 86:7–10.

### *5. Timothy Grable*

In June 2019, Timothy Grable began working as a stock associate/cart pusher at a Walmart store in Columbia City, Indiana. (Doc. 95-25, pp. 10:25–11:3, 11:10–16 (Grable Dep.); Doc. 110-22, p. 15). Mr. Grable testified that he has a learning disability and has also been diagnosed with attention deficit hyperactivity disorder ("ADHD"). (Doc. 95-25, pp. 28:3–29:19 (Grable Dep.)). Mr. Grable had an IEP in high school, which allowed an aide to attend classes with him. *Id.* at 26:20–27:6. Mr. Grable testified that his learning disability "affects [him] in a lot of ways" and that he has a "third-grade reading level." *Id.* at 31:4–8. Mr. Grable testified that he told Walmart during hiring about his learning disability and ADHD diagnosis. *Id.* at 59:14–61:4, 71:25–72:22.

Mr. Grable testified to taking his first PGA attempt four months into his employment with Walmart and that he took his second attempt just two days after the first. *Id.* at 51:7–17. Mr. Grable testified that he requested help during his first PGA attempt because he "didn't understand the question or some of the answers." *Id.* at 53:4–20, 59:5–13, 89:5–9. Mr. Grable stated that he was given "a little bit" of help during his first attempt, but the person providing the assistance "had to help other people." *Id.* at 55:3–13, 89:5–90:1. Thus, EEOC disputes the reasonableness and effectiveness of such assistance and argues that Walmart did not utilize the accommodations that are pre-approved in its Pathways Accommodation policy. (Doc. 109, p. 19–20).

Mr. Grable testified that, on his third and final PGA attempt, the assistant manager told him to "hurry up [and] get back doing carts" even though Mr. Grable was "trying to

take [his] time" on the exam. (Doc. 95-25, 65:13–66:9, 72:18–22 (Grable Dep.)). Mr. Grable stated that he did not understand the material, questions, or answers on the PGA, which tested information not related to his cart management duties. *Id.* at 34:10–20, 77:9–25, 84:2–22, 90:3–13. Mr. Grable testified that he believed he could have passed the test "after [he] had studied," but that he expected to review the previous questions he had answered correctly and incorrectly with "the HR lady." Mr. Grable stated that this did not occur after any of his attempts. *Id.* at 67:1–68:3, 77:20–25, 86:14–87:14, 98:1–100:22.

Mr. Grable was terminated after failing the PGA three times. *Id.* at 14:5–7, 32:18–33:5. He testified that he felt "a little heartbroken, a little mad, [and] upset" by his termination. *Id.* at 78:13–79:1.

***6. Chriss Ouellette***

Chriss Ouellette was hired by Walmart in November 2018 as a seasonal cashier in Norwich, Connecticut. (Doc. 95-27, p. 104:22–24 (Ouellette Dep.)). Ms. Ouellette has been diagnosed with dyslexia, anxiety, major depressive disorder, and post-traumatic stress disorder ("PTSD"). *Id.* at 17:17–18, 19:25–20:14, 21:10–12. According to her deposition, these conditions affect her ability to read and comprehend. *Id.* at 158:5–25. For example, Ms. Ouellette testified that dyslexia causes her to "see numbers upside down" and to see "letters backwards." *Id.* at 155:9–13. While in school, Ms. Ouellette repeated the fifth grade three times, the eighth grade twice, and the ninth grade three times before ultimately dropping out in the ninth grade. *Id.* at 69:19–24, 159:1–6. Ms. Ouellette testified that she did not disclose her conditions to Walmart during hiring nor provide Walmart with any documentation regarding her conditions at any time. *Id.* at pp. 104:17–21, 107: 9–18, 121:25–122:15.

Ms. Ouellette took the PGA three times. *Id.* at 107:24–108:1. Ms. Ouellette took her first attempt after finishing a shift. *Id.* at 108:7–17. When she got to work the next day, Ms. Ouellette was told by HR personnel named Mary that she had failed the test and would need to take it again in order to gain full-time employment with Walmart. *Id.* at 107:3–8, 109:4–11, 112:4–13. Ms. Ouellette received the same questions each time she took the PGA. *Id.* at 110:23–25. She took her second attempt "a day or so after" the first, and Ms. Ouellette testified that she "was asked to go immediately in the back to take the test" when she arrived for her shift. *Id.* at 112:10–113:7. However, Ms. Ouellette only "answered one or two questions" before she was asked "to go back out on the floor" because they "were short-staffed that day." *Id.* at 113:4–11. She continued the second attempt after her lunch break. *Id.* at 113:12–24.

Ms. Ouellette testified that each time she took the PGA she told Mary that she needed assistance with the test because her dyslexia and anxiety were making it difficult for Ms. Ouellette to read, comprehend, and understand the exam. *Id.* at 115:18–116:20. According to Ms. Ouellette, Mary said that she would assist Ms. Ouellette on the exam, but that did not happen because she kept getting "called away" and going "in and out" of the testing room. *Id.* at 118:18–25. When Mary informed Ms. Ouellette that she had failed the second attempt, Mary advised Ms. Ouellette that if she "take[s] the test again and [ ] fail[s], [she] will be terminated." *Id.* at 118:16–15. Ms. Ouellette testified that she "was sad" and tried to ask Mary about her performance on the previous attempts, but Mary told Ms. Ouellette that "she couldn't give [Ms. Ouellette] any specific answers." *Id.* at 119:16–120:2.

Ms. Ouellette testified that before her third attempt, she told her supervisor, Judy, that if she failed the PGA again she would be terminated and asked Judy for assistance on the exam. *Id.* at 123:3–20. According to Ms. Ouellette, Judy said "she would try to find somebody to help" but that "she couldn't make any promises." *Id.* at 123:16–23. Ms. Ouellette testified that, on her third and final PGA attempt, another associate sat with her and helped her understand the questions she needed assistance with. *Id.* at 124:4–19. Despite this assistance, Ms. Ouellette failed her third attempt and was terminated in January 2019. *Id.* at 126:1–14, 160:1–2.

***7. Ernest Smith, Sr.***

Ernest Smith, Sr., began working at a Walmart store in 2017. (Doc. 95-28, pp. 53:25–54:4 (Smith Dep.)). Prior to his employment at Walmart, Mr. Smith suffered a brain injury at a previous job, when a metal "plate broke off [a] machine and struck [him] in the skull," and caused fractures in his skull and neck. *Id.* at 22:22–23:17. During the accident, "[t]he plate stuck [Mr. Smith's] forehead" and "shattered [his] skull," "fractured [his] neck," and "smashed a lot of vertebrae together." *Id.* at 24:4–9. As a result, Mr. Smith "had to have the front part of [his] brain surgically cut because of the bone fragments" and has nerve damage. *Id.* at 24:9–25:1. Over the course of twelve years, Mr. Smith had multiple surgeries and participated in outpatient rehabilitation. *Id.* at 25:2–20. This injury slowed Mr. Smith's thinking and information processing. *Id.* at 51:7–8, 60:15–18, 61:19, 65:16–24.

Mr. Smith testified that he did not request assistance on his first PGA attempt, but he realized while taking the exam that it was more complicated than he expected. *Id.* at 128:4–129:1. After failing his first attempt, Mr. Smith told the store co-manager that he

had difficulty with the exam. *Id.* at 129:2–15. According to Mr. Smith, his manager said he could receive help but did not specifically assign anyone to help Mr. Smith on his second attempt. *Id.* at 129:16–130:5, 133:5–10. Mr. Smith received help from coworkers on his second and third attempts, but he did not find the assistance helpful. *Id.* at 130:1–132:22. Mr. Smith was terminated after failing the PGA three times. *Id.* at 142:23–143:3.

Approximately a month and a half after his termination, Mr. Smith was rehired at Walmart in April or May of 2018. *Id.* at 56:14–57:1. He took the PGA a fourth time and received assistance on it. *Id.* at 166:15–18. Mr. Smith passed the PGA on his fourth attempt and worked for Walmart for approximately five more years before voluntarily resigning in or around June of 2023. *Id.* at 55:19–56:17, 57:7–21, 127:10–12, 166:2–18.

***8. Sonya Allen***

In June 2019, Sonya Allen began working as a cashier and a self-checkout host at a Walmart store in Phoenix, Arizona. (Doc. 95-29, pp. 28:6–18, 55:10–12, 61:25–62:3 (Allen Dep.)). Ms. Allen testified that she informed her manager during orientation that she would need assistance on the PGA because of her disability. *Id.* at 59:19–22, 99:14–22. Ms. Allen testified that she has a learning disability which makes it difficult for her to focus, read, comprehend, and work at a fast pace. *Id.* at 90:24–91:1, 92:14–93:7. Ms. Allen had an IEP in school that provided special learning assistance, and she attended special education courses from sixth to ninth grade. *Id.* at 91:2–92:12. Ms. Allen's highest level of education is the ninth grade. *Id.* at 91:15–16.

According to Ms. Allen, she was told she would get assistance on the PGA. *Id.* at 59:19–22, 99:14–22. Ms. Allen testified that on her first attempt, she asked a manager for help, but the manager did not provide assistance. *Id.* at 58:22–59:2, 100:9–20. Ms. Allen

took and failed the PGA twice. *Id.* at 100:9–11, 101:19–23. Ms. Allen did not request assistance during her second PGA attempt because, according to Ms. Allen, the supervisor present was the same one who refused to assist her during her first attempt. *Id.* at 62:4–17. Ms. Allen testified that she took the PGA a third time in August 2019 and passed. *Id.* at 58:17–19, 68:10–15, 101:25–102:3. However, Walmart's records do not reflect Ms. Allen's third time taking the test, and Ms. Allen was terminated in February 2020 for failing the PGA. 71:2–13, 73:18–21.

***9. Tamra Norrod***

Tamra Norrod began working in the deli department and as a shelf stocker at a Walmart store in 2019. (Doc. 95-30, pp. 31:25–32:7, 36:25–21 (Norrod Dep.)). Ms. Norrod testified that she told Walmart that she had a learning disability and ADHD when she applied. *Id.* at 14:20–22, 113:16–17, 115:3–7, 116:2–117:1. Ms. Norrod took the PGA twice and testified that she asked for assistance on the exam because she was having trouble understanding it due to her disability. *Id.* at 58:21–59:23. According to Ms. Norrod, she asked for the questions to be read aloud, but the person supervising Ms. Norrod's test told her that wasn't allowed because it would be giving her the answers, so Ms. Norrod should "[j]ust try [her] best." *Id.* at 59:9–23, 60:5–13, 96:20–11, 122:7–123:7, 125:11–16, 127:7–16.

Ms. Norrod was terminated the same day as her second attempt on the PGA. *Id.* at 56:23–57:2, 131:24–132:4. Ms. Norrod testified that the managers who terminated her did not know about her learning disability. *Id.* at 67:21–68:1, 129:13–19.

***10. Dakari Williams***

Dakari Williams began working at Walmart as a cart pusher around September 2019. (Doc. 95-31, pp. 48:25–49:11 (Williams Dep.)). Mr. Williams testified that he told a Walmart manager during his interview that he had a learning disability and had difficulty reading. *Id.* at 12:14–15, 68:21–22, 92:2–18. Mr. Williams testified that he asked the same associate for help on the PGA each time that he took the exam and that the associate told Mr. Williams that she could not help him. *Id.* at 52:3–16, 56:1–57:19. Mr. Williams testified that he told the associate about his learning disability. *Id.* at 69:17–70:13.

Mr. Williams took the PGA three days in a row and failed each time. *Id.* at 57:20–58:5. Mr. Williams testified that, after his third attempt, he and his job coach spoke with Walmart's manager about Mr. Williams' need for assistance and that during that conversation, the manager assured Mr. Williams and his job coach that Walmart would not terminate his employment. *Id.* at 58:3–14, 59:3–60:24. 63:5–14, 69:20–22, 70:9–13. However, Walmart terminated Mr. Williams for failing the PGA three times. *Id.* at 52:2–16.

***11. Heaven Wright***

Heaven Wright briefly worked at Walmart in 2017, but she voluntarily resigned after a few months because she was moving. (Doc. 95-32, p. 85:13–18 (Wright Dep.)). Ms. Wright applied to work at the same Walmart location again in June 2018. *Id.* at 88:4–24. During her second interview with Walmart, Ms. Wright claims that she explained that she had a learning disability and "would need help in certain ways due to [her] reading, [her] mathematics skills, [and her] verbal comprehension." *Id.* at 150:4–17. Ms. Wright was rehired by Walmart for a cashier position, and she had to go through Pathways training.

*Id.* at 91:18–92:4. Ms. Wright did not provide documentation pertaining to her disability when filling out her onboarding paperwork. *Id.* at 93:20–23.

Ms. Wright took and failed the PGA three times, receiving some assistance on the first attempt but none on the second or third attempts. *Id.* at 97:1–2, 109:7–13, 110:25–111:3, 111:20–25, 158:3–159:17, 160:16–22, 161:2–10. Ms. Wright testified that she was terminated in front of another employee, which felt "humiliating," and she was "crying and upset." *Id.* at 130:1–131:6.

When Ms. Wright was informed that she was being terminated, she told her manager that she had a learning disability, and the manager invited her to submit documentation within three days. *Id.* at 112:14–25. Ms. Wright provided school records that documented her disability to Walmart, but no further action regarding her employment status was taken. *Id.* at 112:14–114:20. Ms. Wright testified that she contacted Walmart several times after providing her disability documentation but gave up after Walmart continued to be unresponsive to her inquiry for six months. *Id.* at 114:1–24.

## III. DISCUSSION

As noted, EEOC brings three claims under the ADA: (1) that Walmart's use of the PGA unlawfully screened out, or tended to screen out, individuals with disabilities, (2) that Walmart failed to provide the Charging Parties and Claimants reasonable accommodations to take the PGA, and (3) that the Charging Parties and Claimants were discharged when they failed to achieve Walmart's minimum required score on the PGA. (Doc. 41). EEOC is seeking injunctive relief, compensatory and punitive damages, and costs. *Id.*

On March 20, 2026, Walmart filed a Motion for Partial Summary Judgment on several grounds. First, Walmart argues that Count One of EEOC's Second Amended Complaint, although styled as a disparate-treatment claim, is actually a disparate-impact claim, which EEOC has failed to meet its evidentiary burden in proving. Next, Walmart seeks summary judgment on all claims asserted on behalf of Claimants Cannady and McFall because EEOC cannot establish a prima facie case of discrimination for either Claimant. Then, Walmart moves for summary judgment on EEOC's failure-to-accommodate claims (Count Two) asserted on behalf of Charging Party Walker and Claimants Butler, Cannady, Grable, Gray, McFall, Ouellette, and Smith. Finally, Walmart argues that EEOC is not entitled to injunctive relief or punitive damages and that, regardless, a statute of limitations bars the EEOC from pursuing monetary relief on behalf of all eleven Claimants. The Court will take each argument in turn.

### A. First Claim for Relief: Disparate Impact

Count One of the Second Amended Complaint seeks relief for disability discrimination under 42 U.S.C. § 12112(a) and (b)(6). (Doc. 41, ¶¶ 53–60). Section 12112(b)(6) prohibits "employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." Walmart contends that this Court should evaluate the First Claim for Relief as a disparate-impact claim and that EEOC must offer comparative statistical evidence to prove the claim, which EEOC has not done. (Doc. 96, pp. 12–14). By contrast, EEOC argues that it does not plead a disparate-impact claim. Rather, according to EEOC, the statutory scheme of § 12112(b)(6) permits claims to be brought by an individual plaintiff, and those

claims do not require statistical evidence to establish the initial burden. Courts are divided on this issue.

To begin, the Supreme Court has acknowledged that "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA," but the claims are distinct. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). "The key element" in disparate treatment cases "is discriminatory intent,"," *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)), whereas, disparate-impact claims involve "employment practices, adopted without a deliberately discriminatory motive, [but] may in operation be functionally equivalent to intentional discrimination," *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 953 (8th Cir. 2001) (citation omitted).

There is no clear consensus among courts concerning disparate-impact claims within the context of the ADA. *See Leskovisek v. Ill. Dep't of Transp.*, 506 F.Supp.3d 553, 566–69 (C.D. Ill. 2020) ("[T]he Fifth and Ninth Circuits recogniz[e] 'that an individual advancing an ADA disparate-impact claim need not present statistical evidence if he or she can show that a job qualification screens out the plaintiff on the basis of his or her.") (collecting cases); *but see Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (holding that the complaint failed to state a claim of disparate-impact discrimination under the ADA since it was "devoid of any factual content . . . tending to show that the City's testing process . . . caused a relevant and statistically significant disparity between disabled and non-disabled applicants") (citation modified); *Smith v. Miami-Dade Cnty.*, 621 F. App'x 955, 961 (11th Cir. 2015) ("For a disparate-impact claim to succeed, a plaintiff

must show that a facially neutral employment practice had a significant discriminatory effect on a single group of people.").

The Eighth Circuit has consistently required statistical evidence to establish a prima facie disparate-impact claim under Title VII and the Age Discrimination in Employment Act. *See Evers*, 241 F.3d at 953 (To establish an age discrimination "prima facie case of disparate-impact" the plaintiff must "identify[ ] a specific employment practice and then present[ ] statistical evidence of a kind and degree sufficient to show that the practice in question caused the plaintiff to suffer adverse employment action because of his or her membership in a protected group."); *Williams v. Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1040 (8th Cir. 2018) ("To satisfy the elements of a prima facie disparate-impact claim [under Title VII], plaintiffs must demonstrate: '(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two.'"). Furthermore, the Eighth Circuit has explained that "[d]isparate treatment claims under Title VII [and] the ADA . . . are analyzed in the same manner." *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 677 (8th Cir. 2013) (citing *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012)).

Thus, in the absence of direct authority and applying the logic of *Evers*, *Williams*, and *Evance*, the Court agrees with Walmart that a prima facie case of unlawful screening under a disparate-impact theory requires statistical evidence showing that the employment policy or practice caused a disparate effect on people with a qualified disability. Indeed, the PGA was neutral on its face and uniformly applied to all newly-hired associates, and EEOC's claim rests on the test's discriminatory effect of screening out or tending to screen out individuals with disabilities. *See Boersig v. Union Elec. Co.*, 219

F.3d 816, 822 (8th Cir. 2000) (defining such claims as "invoking a disparate-impact theory of ADA liability"). After extensive discovery, the record reveals that out of 711,403 associates who took the PGA, Walmart provided EEOC with contact information of 5,391 associates who were discharged after failing it. From there, EEOC identified 226 potential aggrieved individuals. Now, EEOC brings claims on behalf of only 11 of those individuals.[3] EEOC has therefore failed to establish a prima facie case for their unlawful-screening claim because it presented no statistically significant evidence showing that the PGA disproportionately impacted people with disabilities. Accordingly, Walmart's Motion for Partial Summary Judgment (Doc. 95) is **GRANTED** as to the First Claim for Relief.

### B. *Prima Facie* Case of Disability Discrimination: Cannady and McFall

Walmart next argues that EEOC has failed to establish a prima facie case of discrimination on behalf of Claimants Cannady and McFall and asks this Court to grant summary judgment on all claims asserted on their behalf. Walmart does not dispute that Cannady and McFall were disabled within the meaning of the ADA. Instead, EEOC and Walmart dispute whether Ms. Cannady was a qualified individual protected by the ADA and whether Ms. Cannady's and Ms. McFall's terminations were based on their disabilities.

"The ADA bars private employers from discriminating against a 'qualified individual on the basis of disability.'" *Faidley v. United Parcel Serv., Inc.*, 889 F.3d 933, 940 (8th Cir. 2018) (en banc) (quoting 42 U.S.C. § 12112(a)). "To obtain relief under the ADA," an

[3] In opposing the significance of these statistics, EEOC maintains in its briefings that it is the "master of its own case" and that it "may but is not required to secure relief for all of those aggrieved by Walmart's unlawful employment practices." (Doc. 104, p. 7). To the extent that EEOC is suggesting it merely chose not to represent other aggrieved individuals in this action, the Court does not find this argument to be persuasive.

employee is "required to show that he [or she] was a disabled person within the meaning of the ADA, was qualified to perform the essential functions of his job, and suffered an adverse employment action because of his [or her] disability." *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009) (citation omitted); *see Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 988 (8th Cir. 2007) ("A plaintiff alleging discrimination based on disability under the ADA must establish a prima facie case."); *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) ("To establish a *prima facie* case of discrimination under the ADA, an employee must show that she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment decision because of the disability."). "[T]he threshold of proof necessary to establish a prima facie case is minimal. The prima facie burden is not so onerous as, nor should it be conflated with, the ultimate issue of discriminatory action." *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (citations omitted).

Beginning with Ms. Cannady, Walmart argues that she was unqualified because of reoccurring attendance issues, which was the ultimate cause for her termination. "To be a qualified individual under the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for [her] position; and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" *Kallail*, 691 F.3d at 930 (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)). Walmart does not dispute that Ms. Cannady possessed the requisite skill, education, experience, and training for her position. The disputed issue is whether Ms. Cannady was

able to perform the essential functions of her job, with or without reasonable accommodation.

"Essential functions of a position are the fundamental duties of the job, but not its marginal functions." *Kallail*, 691 F.3d at 930 (citation omitted). "Determining the essential functions of a job is a 'fact-intensive issue'" which looks to "factors such as the employer's judgment, the written job description prepared before interviewing applicants, [and] the consequence of not requiring the plaintiff to perform the function . . . ." *Kendall v. Zoltek Corp.*, 174 F.4th 1002, 1008 (8th Cir. 2026) (quoting *Faidley*, 889 F.3d at 941). "Although the employee has the ultimate burden of proving that [s]he is a qualified individual" and entitled to protection under the ADA, "an employer who disputes [her] claim that [s]he can perform the essential functions of the job must put forth evidence establishing those functions." *Id.* (alterations in original) (internal quotations omitted) (quoting *Dropinski v. Douglas Cnty.*, 298 F.3d 704, 707 (8th Cir. 2002)).

Here, Walmart argues that job attendance is an essential function of Ms. Cannady's cashier position and that her excessive absences rendered her unqualified. The Eighth Circuit has "consistently stated that 'regular and reliable attendance is a necessary element of most jobs.'" *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 670 (8th Cir. 2019) (quoting *Lipp*, 911 F.3d at 544). Walmart did not provide a written attendance policy in support of its motion, but Ms. Cannady's personnel records show that orientation included a segment dedicated to "Attendance, Punctuality, & Occurrence." (Doc. 110-20, p. 36). All of the "essential functions" listed in Walmart's Cashier Job Description—which included assisting customers, operating cash registers, and processing customer transactions—required being present on Walmart's premises. *Id.* at 26.

Further, a review of Ms. Cannady's attendance records reveals that, within a three-month period, she accumulated "occurrence" points for arriving late to her shift eight times and missing a shift entirely without giving notice. (Doc. 95-19). Ms. Cannady's termination records indicate that her termination was based, at least in part, on "No Call/No Show or Excessive Absences and/or Tardies." (Doc. 95-20). This, Walmart reasons, conclusively demonstrates that regular and reliable attendance was an essential function of Ms. Cannady's job, and her excessive absences rendered her unqualified under the ADA.

EEOC does not dispute the accuracy of Walmart's attendance records. Instead, EEOC focuses on the timeline of her PGA attempt and subsequent discharge, which the Court understands to be an argument that Ms. Cannady's attendance and tardiness did not bear on an essential function of her job at Walmart. In support of its position, EEOC highlights that three of Ms. Cannady's attendance-related "occurrence" points were acquired after she took the PGA. Indeed, according to the Pathways Implementation Guides, associates would not be approved to take the PGA unless they have passed the first qualifier—the Attendance Check—which was an "[a]utomatic system check . . . to determine if the associate [was] in compliance with the Attendance Policy." (Doc. 95-1, p. 29; Doc. 110-9, p. 23). It is undisputed that Ms. Cannady was allowed to take the PGA and that she was terminated one week later. (Doc. 109, pp. 12, 13). Above all, EEOC points out that Walmart included Ms. Cannady on a list identifying associates who were terminated due to failing the PGA. (Doc. 109, p. 13; Doc. 110-8).

"At this stage in the proceedings," this Court "cannot make credibility determinations and must view the evidence in the light most favorable to [EEOC]. Even 'thin' evidence that creates a disputed issue of material fact is sufficient." *Kilmek v.*

*CentraCare Health Sys.*, 178 F.4th 1158, 1165 (8th Cir. 2026) (citing *Fenney*, 327 F.3d at 716 (summary judgment not appropriate when plaintiff's evidence "creates—at a minimum—a reasonable inference from which an issue of material fact can be drawn"). Moreover, "when deciding whether a duty is an essential job function, an employer's judgment, while probative, is 'merely evidence and is not conclusive.'" *Id.* (citing *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004)). With that in mind, the Court finds that there is sufficient evidence in the record to create a genuine issue of material fact as to whether punctuality to scheduled shifts—or compliance with Walmart's attendance policy that is not included in the record—was an essential function of Ms. Cannady's cashier job, which is determinative in deciding whether she was a qualified individual and thus protected under the ADA. The Court also concludes that Ms. Cannady's ultimate termination satisfies the third requirement of a prima facie ADA case—that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination based on disability.

Turning now to Ms. McFall, the Court finds Walmart's argument regarding her deposition testimony to be specious at best. Walmart cherry-picks a single question and answer from nearly one hundred pages of deposition testimony to argue that there is no dispute as to whether a causal link exists between Ms. McFall's deafness and her failing the PGA. (Doc. 96, p. 19; Doc. 114, pp. 10–11; Doc. 95-22, p. 64:16–18). In doing so, Walmart mischaracterizes Ms. McFall's testimony as a whole by ignoring the multiple other statements Ms. McFall made that directly contradict Walmart's position.

For example, there were several instances during Ms. McFall's testimony in which her initial answer was later contradicted by a more developed response after further

questioning on the same topic. *See id.* at 27:8–18, 28:7–24, 29:3–24 (discussing Ms. McFall's employment history); *id.* at 71:20–72:8 (discussing her surprise at being terminated). These discrepancies appear to stem from a linguistic disconnect, rather than any intentional falsehood by Ms. McFall. In other words, these instances illustrate the language barrier that deaf individuals may face when reading or communicating in English—the very barrier that provides the causal link between Ms. McFall's disability and her termination for failing the PGA, which Walmart now attempts to deny. The fact is that when Walmart rephrased deposition questions in response to unclear answers, Ms. McFall testified consistently that her deafness caused her to fail the PGA. The Court therefore disagrees with Walmart's claim that Ms. McFall "unequivocal[ly] admi[tted]" her deafness was unrelated to the PGA. (Doc. 114, pp. 10–11).

The Court finds *EEOC v. Drivers Management, LLC*, to be instructive. That case involved an ADA claim on behalf of a deaf individual who was denied an over-the-road truck-driver position. On the issue of causation, the employer argued "that there is a distinction between not hiring [the plaintiff] *because* he was deaf and not hiring [the plaintiff] *as a consequence* of his deafness" and that the company decided not to hire the plaintiff "because he could not safely engage in contemporaneous communications with his trainer while driving, without diverting his eyes from the road." 142 F.4th 1122, 1131 (8th Cir. 2025) (emphasis in original). The Eighth Circuit disagreed with the employer and distinguished the facts in *Drivers Management* from other cases upholding adverse employment actions taken against an employee as a consequence of his or her disability. *Id.* They concluded that the "consequences" alleged in *Drivers Management* actually "*describe* [the plaintiff's] disability," which is distinct from situations where "an individual

has a disability but is terminated for other performance deficiencies like a lack of motivation, poor attitude, or data entry errors." *Id.* (emphasis in original).

The Court finds the causation issue in this case to be analogous to the issue presented in *Drivers Management*. Here, Ms. McFall was terminated for failing the PGA. Her supervisor testified in his deposition that "she was a good associate" and "was very reliable and was very willing to take on new tasks and did well in the role that she was in." (Doc. 109-10, p. 46:10–13 (Kord Dep.)). Ms. McFall testified that she failed the PGA because she did not understand the written questions and answers—a consequence of her deafness—and did not have an interpreter to translate the English into ASL. This reasoning is further supported by her ability to pass the PGA on her fourth attempt, when Walmart invited Ms. McFall back after her termination and allowed a coworker to assist her on the exam by explaining questions that she had difficulty understanding. (Doc. 95-22, pp. 49:7–50:3, 50:13–18 (McFall Dep.)). Thus, in viewing the evidence in a light most favorable to EEOC, the Court believes that a reasonable juror could find a causal connection between Ms. McFall's disability and Walmart's termination of her employment.

Accordingly, Walmart's Motion for Partial Summary Judgment (Doc. 95) as to the claims on behalf of Ms. Cannady and Ms. McFall, based on EEOC's alleged failure to establish a prima facie case of discrimination for each Claimant, is **DENIED**.

### C. Failure-to-Accommodate Claims

The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability.'" *Faidley*, 889 F.3d at 940 (quoting 42 U.S.C. § 12112(b)(5)(A)). The Eighth Circuit applies "a modified burden-shifting analysis,"

*Fenney*, 327 F.3d at 712, in which a plaintiff first "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it," *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). "To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an 'interactive process.'" *Kilmek*, 178 F.4th at 1167 (quoting *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009)). The plaintiff has the burden to show that the requested accommodation is reasonable, and then the employer must show undue hardship. *See Peebles*, 354 F.3d at 768.

Walmart moves for summary judgment on the failure-to-accommodate claims asserted on behalf of Charging Party Walker and Claimants Butler, Cannady, Grable, Gray, McFall, Oullette, and Smith. Walmart's arguments fall into two categories: (1) that Charging Party Walker and Claimants Smith, Cannady, and McFall failed to initiate the interactive process by requesting an accommodation, and (2) that Walmart provided accommodations for Claimants Butler, Grable, Ouellette, and Gray.

***1. Interactive Process***

"[A] plaintiff can survive summary judgment on a reasonable-accommodation claim by showing that the employer failed to engage in an interactive process." *Siebrecht v. Mercy Heath Serv.-Iowa Corp.*, 163 F.4th 524, 533 (8th Cir. 2026) (quoting *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 660 (8th Cir. 2022)).

> To establish that an employer failed to participate in an interactive process, a disabled employee must show: (1) the employer knew about the employe's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the

> employee could have been reasonably accommodated but for the employer's lack of good faith.

*Siebrecht*, 163 F.4th at 533. "'There is no per se liability under the ADA if an employer fails to engage in the interactive process,' but at the summary judgment stage such a failure is 'prima facie evidence that the employer may be acting in bad faith.'" *Faidley*, at 943 (quoting *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 813 (8th Cir. 2015)).

However, "[t]he employer is not required to undertake the interactive process until the employee makes a request for accommodation." *Sharbono v. N. States Power Co.*, 902 F.3d 891, 894 (8th Cir. 2018) (citing *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014)). "To trigger the interactive process, the employee must provide the employer with enough information so that the employer knows of the disability and the request for an accommodation." *Kilmek*, 178 F.4th at 1167 (citing *Kowitz v. Trinity Health*, 839 F.3d 742, 748 (8th Cir. 2016)). In doing so, the employee "need not request an accommodation in writing or use 'the magic words reasonable accommodation,' but 'must make clear that the employee wants assistance for . . . [his or] her disability.'" *Powley v. Rail Crew Xpress, LLC*, 25 F.4th 610, 612 (8th Cir. 2022) (quoting *Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002)). "It is the employee's burden to show the limitations of [his or] her disability," *Kilmek* 178 F.4th at 1167, but "[o]nce aware of [an employee's] needs[,] the employer is responsible for considering how to best accommodate them," *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 942 (8th Cir. 2019) (quoting *Kowitz v. Trinity Health*, 839 F.3d 742, 746 (8th Cir. 2016)); *see also Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1021–22 (8th Cir. 2000) (holding that a company's failure to provide active assistance to an employee seeking an accommodation created "at least an issue of fact" about whether it fulfilled its obligations).

Walmart argues that it did not know that Mr. Smith had a disability, that Mr. Smith, Ms. Cannady, and Ms. McFall failed to request accommodations for the PGA, and that Ms. Walker failed to provide documentation of her need for accommodation when asked to by Walmart.

Mr. Smith testified that he had discussed his injuries—both the physical and mental limitations—resulting from the accident at his previous job in detail with his supervisor at Walmart and that he would occasionally receive assistance from his coworkers on tasks such as carrying items, reading stock placement labels, and moving freight from one location to another. Moreover, Mr. Smith testified that he asked his store's co-manager for assistance after he failed the PGA the first time and, according to Mr. Smith, the manager responded by telling Mr. Smith to "find somebody to sit with you to take the test" but did not assist in securing such assistance. (Doc. 95-28, p. 133:5–14 (Smith Dep.)). Mr. Smith testified that he asked coworkers to help him on his second and third PGA attempts, but neither provided substantial assistance nor even stayed in the testing room for the duration of his exam. He was subsequently terminated for failing the PGA three times. Nevertheless, when Mr. Smith returned to Walmart a couple of months later, he was able to pass the PGA with the assistance Walmart provided on his fourth attempt.

Similarly, Ms. Cannady testified that she took the PGA one time on a day in which her care team coach, who accompanied Ms. Cannady during her shifts at Walmart, was not present with her. Ms. Cannady stated that she had difficulty understanding the material on the PGA, explained to the test administrator that she had a disability, and requested the administrator to read the questions and answer aloud to help her—an accommodation Ms. Cannady received during high school. However, Ms. Cannady

testified that the administrator did not provide her assistance and she failed the PGA . Ms. Cannady was subsequently fired by Walmart.

Moreover, Ms. Walker's father notified the store manager of Ms. Walker's disability and need for accommodation on the PGA. Importantly, Walmart's internal policies permitted requests for a job adjustment or a reasonable accommodation by a family member, a friend, a job coach, or a health care professional on behalf of an associate. (Doc. 95-4, p. 2; Doc. 95-6, p. 1). Even more, Ms. Walker's store manager sought advice via email from upper-level HR personnel, acknowledging that Ms. Walker had a disability and was not given accommodations on the PGA, and asking what could be done to prevent Ms. Walker from being processed for discharge.

In sum, the Court finds that the evidence in the record creates a genuine issue of material fact as to whether Walmart engaged in the interactive process or attempted to provide reasonable accommodation to Mr. Smith, Ms. Cannady, and Ms. Walker as required by the ADA. Summary judgment is therefore **DENIED** as to those participants.

As for Ms. McFall, the record does not suggest that she requested accommodation on the PGA and EEOC points to no such evidence. Instead, EEOC argues that Walmart knew that Ms. McFall was deaf and failed to initiate the interactive process "as required by Walmart's Pathways Accommodation policy." (Doc. 104, p. 25). The Court is unpersuaded by EEOC's argument that Walmart's company policies had the effect of "assum[ing] responsibility for initiating the interactive process." *Id.* at 23. Thus, summary judgment is **GRANTED** on Ms. McFall's failure-to-accommodate claim.

### *2. Reasonable Accommodation*

"To satisfy its duty under the ADA, the employer must "make a good faith effort to assist the employee in seeking accommodation." *Ehlers*, 34 F.4th at 661 (citing *Cravens*, 214 F.3d at 1021). "This means that the employer should first analyze the relevant job and the specific limitations imposed by the disability and then, in consultation with the individual, identify potential effective accommodations." *Id.* The Eighth Circuit has held that "a genuine dispute of material fact about whether an employer acted in good faith" exists when the employer "discontinued discussing accommodations [and] did not investigate the employee's abilities." *Ehlers*, 34 F.4th at 661–62 (citing *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 899, 902–03 (8th Cir. 2006)). *See also Battle v. United Parcel Ser., Inc.*, 438 F.3d 856, 862–64 (8th Cir. 2006) (refusing to grant judgment as a matter of law to the employer on the good-faith issue when the jury could conclude that the employee needed accommodation only for "a marginal function that easily could have been eliminated").

Here, Walmart argues that it satisfied its duty to make a good-faith effort to accommodate when it provided Ms. Butler, Mr. Grable, and Ms. Ouellette with the accommodations they requested. The Court disagrees. Starting with Ms. Butler, Walmart did not, in fact, provide the accommodation she requested, which was to remove one answer out of the option choices. Walmart did have someone read the exam aloud to Ms. Butler, but this accommodation did not prove to be enough assistance. Even though Walmart was not required to provide the exact accommodation Ms. Butler requested, it was required to consult with Ms. Butler and identify potential accommodations that *would* have been effective.

Mr. Grable requested assistance on the PGA as he was having difficulty understanding the questions and answers as written. He testified that the person who was supposed to be helping him on his second PGA attempt was unable to assist him on the entire exam because they had to help other people during that same time. Additionally, Mr. Grable testified that, while he was trying hard to focus, the assistant manager interrupted his third and final attempt on the PGA and told him to "hurry up [and] get back to doing carts." (Doc. 95-25, pp. 55:3–13, 89:5–90:1 (Grable Dep.)).

Finally, the Court disagrees with Walmart that "Mr. Gray provides a perfect example of Walmart's good-faith and the efficacy of its accommodation policies." (Doc. 96, p. 19). Walmart declined to provide Mr. Gray an accommodation on the PGA when he requested assistance on his second attempt. Walmart subsequently terminated Mr. Gray when he failed the second time. Only after vocation rehabilitation services intervened on behalf of Mr. Gray, once he had been discharged, did Walmart allow Mr. Gray to take the PGA with assistance. Mr. Gray was able to earn a passing score on the third attempt. The Court does not believe that this exemplifies an employer's good-faith duty under the ADA. Rather, in all of the above situations, a reasonable juror could very well conclude under the circumstances that Walmart did not appropriately accommodate Mr. Gray when he sought accommodation. Accordingly, the Court finds that the evidence in the record, viewed in a light most favorable to EEOC, creates a genuine issue of material fact as to whether Walmart made a good-faith effort to give reasonable accommodations to Ms. Butler, Mr. Grable, and Mr. Gray on the PGA. Thus, summary judgment is **DENIED** as to those participants.

By contrast, Walmart provided Ms. Ouellette with assistance on the PGA by allowing someone to read aloud the questions and answers. This accommodation was evidently effective, as Ms. Ouellette testified to only needing to use such assistance on three or so questions. Therefore, summary judgment is **GRANTED** as to Ms. Ouellette on this claim.

**D. Injunctive Relief**

Once it has been established "that an employer has 'intentionally engaged in . . . an unlawful employment practice,' the district court 'may enjoin [the employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . equitable relief." *Drivers Mgmt.*, 142 F.4th at 1138 (quoting 42 U.S.C. § 2000e-5(g)(1)); *see also* 42 U.S.C. § 12117(a) (making § 2000e-5(g) applicable to the ADA). When granting an injunction, it is necessary for the court to "consider 'whether the employer's discriminatory conduct could possibly persist in the future.'" *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (8th Cir. 2001). "[T]he court must balance three factors to determine if injunctive relief is appropriate: (1) the threat of irreparable harm . . ., (2) the harm to be suffered . . . if the court grants the injunction, and (3) the public interest at stake." *Drivers Mgmt.*, 142 F.4th at 1138 (quoting *Wedow v. City of Kan. City*, 442 F.3d 661, 676 (8th Cir. 2006)).

Here, EEOC requests this Court to impose a permanent injunction that mandates Walmart refrain (1) from engaging in any employment practice which discriminates based on disability or the need for a reasonable accommodation; (2) from discriminating against individuals with disabilities; and (3) from interfering with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of

his or her having aided or encouraged any other individual in the exercise or enjoyment of any right protected by the ADA. (Doc. 41, p. 20). The Court finds the proposed injunction to be impermissibly vague. *See* Fed. R. Civ. P. 65(d)(1)(B)–(C) (explaining that an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"). "Broad language in an injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck from an order for injunctive relief, for it is basic to the intent of Rule 65(d) that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Calvin Klein Cosm. Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 444 (1974)). As such, summary judgment is **GRANTED**.

**E. Damages**

Walmart argues that the monetary relief claims brought on behalf of the all Claimants are time-barred. Walmart further argues that punitive damages are inappropriate as a matter of law.

***1. Statute of Limitations***

This is an enforcement action brought pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5. *See* 42 U.S.C. § 12117(a) (making "the powers, remedies, and procedures set forth in" § 2000e-5 applicable to the ADA). Section 706 authorizes the EEOC "to prevent any person from engaging in any unlawful employment practice." § 2000e-5(a). Here, the parties agree that EEOC's claims are subject to a 300-day statute of limitations look-back period. *See Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 898 (8th Cir. 2024) ("Plaintiffs must file a charge with the EEOC within 300 days of the

alleged 'unlawful employment practice.'" (citing § 2000e-5(e)(1)). The dispute arises from disagreements concerning which date should be used to measure the limitations period.

In essence, Walmart believes that EEOC's claims seeking monetary relief on behalf of the eleven non-Charging Party Claimants are time-barred because those claims allege discrimination by Walmart that occurred prior to September 30, 2020. Walmart argues that it first became aware of EEOC's intention to expand its investigation nationwide when it received a letter from EEOC on July 27, 2021. Thus, in Walmart's view, EEOC's claims fail as a matter of law to the extent that they seek monetary relief on behalf of the eleven Claimants in this case, as those claims arose more than 300 days before the EEOC notified Walmart that it had expanded its investigation to charges of discrimination related to the PGA for employees nationwide. Alternatively, Walmart contends that it is "at least entitled to summary judgment on the damages claims of Mr. Gray and Ms. McFall" because "both were terminated more than 300 days before Ms. Scott's charge, rendering their claims time barred." (Doc. 114, p. 8 n.2).

EEOC responds by first insisting that Walmart cannot seek summary judgment based on the statute of limitations because Walmart failed to raise the affirmative defense in its Answer (Doc. 45) to the Second Amended Complaint (Doc. 40). Generally, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations." Fed. R. Civ. P. 8(c). However, the Eighth Circuit has "decline[d] to adhere to a construction of the Rule that would privilege 'form over substance,'" and instead has held that "[a]s long as 'an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, technical failure to comply with Rule 8(c) is not fatal.'" *Crutcher v. MultiPlan, Inc.*, 22 F.4th 756, 765–66 (8th

Cir. 2022) (quoting *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007)). Here, EEOC did not argue that it would be unfairly surprised or prejudiced by the inclusion of the statute of limitations defense, despite Walmart's failure to raise the defense in its answer, nor could EEOC credibly claim prejudice. Walmart has raised the defense in a summary judgment motion and EEOC has responded to it in the answering brief. All facts relevant to the defense are already on the record. Thus, the Court will address the merits of the statute of limitations defense.

In that regard, EEOC asserts that the appropriate date to measure the 300-day limitations period is the filing date of the original charge of discrimination. The Court agrees. Upon review of the statutory framework setting forth the administrative charge procedures, the plain language of Section 706 makes specific reference to the filing of a "charge" and reflects Congressional intent that the charge date is intended to be the benchmark for the limitations period. § 2000e-5(a), (e)(1), (f)(1)–(2). Therefore, the Court concludes that the claims brought by EEOC shall be limited to those alleged to have been based upon events that occurred within 300 days of the earliest charge that gave rise to EEOC's instant enforcement action rather than, as Walmart argues, the date it received notice that EEOC was expanding of the scope of the investigation. *See Cobb v. Stinger*, 850 F.2d 356, 359 (8th Cir. 1988) ("The purpose of filing a charge with EEOC is to provide the Commission an opportunity to investigate and attempt a resolution of the controversy through conciliation before permitting the aggrieved party to pursue a lawsuit." In light of "the remedial purposes of Title VII . . . the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination.") (citations omitted); *EEOC v. Delight*

*Wholesale Co.*, 973 F.2d 664, 668–69 (8th Cir. 1992) ("The permissible scope of an EEOC lawsuit . . . may extend to any discrimination like or related to the substance of the allegations in the charge and which reasonably can be expected to grow out of the investigation triggered by the charge.") (citation omitted); *Paige v. State of Cal.*, 102 F.3d 1035 (9th Cir. 1996) (district court certified a class on disparate-impact claim when class claims were not raised in the administrative charge of discrimination because the charge was sufficiently specific to involve the defendant employer's overall promotional process such that "[a] class based investigation and lawsuit could reasonably be expected to grow out of the allegations pertaining to the examination process used by the defendant").

Walmart primarily relies on non-binding authority to support its position. *See EEOC v. Optical Cable Corp.*, 169 F. Supp. 2d 539, 547 (W.D. Va. 2001) (when EEOC's investigation into an individual charge of race discrimination resulted in reasonable cause to believe that the defendant had engaged in systemic race discrimination and systemic sex discrimination, the "filing dates" for the newly added "pattern or practice claims were the dates on which the EEOC notified the defendant that it was expanding its investigation to encompass [the] charges"); *EEOC v. Freeman*, 2011 WL 337339, at *1 (D. Md. Jan. 31, 2011) (where EEOC had filed a discrimination complaint seeking § 706 relief in a group action, the court concluded that the "filing" date for claims of discrimination that were not included in the original charge was the date on which the EEOC notified the defendant that it was expanding its investigation to encompass the new claims). Along with being non-binding, these two cases only discuss the effect on the filing date when *novel claims* for relief not embraced by the original charge are added to the litigation;

whereas here, EEOC asserts the *same claims* on behalf of each Charging Party and Claimant, and those claims were embraced by the original charge.

Turning now to the question of which filing date will be used to measure the 300-day period, the Court disagrees with EEOC to the extent it argues that the operative charge filing date in this case is June 8, 2018. EEOC suggests that Walmart was put on notice of the relevant claims on the date June 8, 2018, when an individual named Alexsis Auerbach filed a charge of discrimination relating to the PGA. (Doc. 109, pp. 8, 10; Doc. 110-1). However, Ms. Auerbach is not a participant in this action, so the Court declines to define the relevant limitations period based on the filing date of her EEOC charge. Instead, the Court finds that the triggering date for the statute of limitations in this case is November 20, 2018—the date of the earliest EEOC Charge signed by Charging Party Scott—which would allow EEOC to bring claims of discrimination that arose 300 days prior, on or after January 24, 2018.

As for the opt-in Claimants that have not filed administrative charges, the Court finds that they may "piggyback" on Ms. Scott's properly filed charge for the purposes of this litigation as long as their individual claims arise out of the relevant limitations period. *Anderson v. Unisys Corp.*, 47 F.3d 302, 308 (8th Cir. 1995); *Kloos v. Carter-Day Co.*, 799 F.2d 397, 400 (8th Cir. 1986); *see Robinson v. Sears, Roebuck & Co.*, 111 F. Supp. 2d 1101, 1117 (E.D. Ark. 2000) ("[T]he 'piggybacking' rule" is "applicable if two essential requirements are met: (1) the charge being relied upon must be timely and not otherwise defective; and (2) the individual claims of the filing and non-filing plaintiffs must have arisen out of similar discriminatory treatment in the same time frame."); *see also EEOC v. Fred Meyer Stores, Inc.*, 759 F. Supp. 3d 1084, 1089–90 (E.D. Wash. 2024) ("[C]laims

that do not include a discrete act occurring on or after . . . 300 days before the date of [the charging party's] filing . . . are time barred."). Accordingly, the Court finds that the damages claims brought on behalf of Mr. Gray are time barred because he was terminated by Walmart in April 2017. Similarly, the damages claims brought on behalf of Ms. McFall are time barred because she was terminated in June 2017.

### *2. Punitive Damages*

Walmart asks this Court to grant summary judgment on EEOC's request for punitive damages. In the alternative, Walmart asks to bifurcate the issue of punitive damages from the rest of the trial. The Court declines to grant summary judgment on the issue of punitive damages at this juncture and will **DEFER** its ruling until the close of all evidence at trial. EEOC will have an opportunity to proffer the trial evidence that merits a punitive damages instruction at the jury instruction conference at the close of trial. As for the Motion to Bifurcate Consideration of Punitive Damages (Doc. 117), Walmart's request is **DENIED**.

## IV. CONCLUSION

Walmart's Motion for Partial Summary Judgment (Doc. 95) is **GRANTED IN PART, DENIED IN PART**, and **DEFERRED IN PART**; and the Motion to Bifurcate Consideration of Punitive Damages (Doc. 117) is **DENIED** as follows:

(1) Request for summary judgment on the First Claim for Relief in EEOC's Second Amended Complaint (Doc. 41) is **GRANTED**.

(2) Request for summary judgment on all claims on behalf of Claimants Cannady and McFall is **DENIED**.

(3) Request for summary judgment on the failure-to-accommodate claims for Mr. Smith, Ms. Cannady, Ms. Walker, Ms. Butler, Mr. Grable, and Mr. Gray is **DENIED**. Request for summary judgment on the failure-to-accommodate claims for Ms. McFall and Ms. Ouellette is **GRANTED**.

(4) Request for summary judgment on injunctive relief is **GRANTED**.

(5) Request for summary judgment based on statute of limitations is **GRANTED** for claims on behalf of Mr. Gray and Ms. McFall and **DENIED** for all other Claimants.

(6) Request for summary judgment on issue of punitive damages is **DEFERRED** until the close of all evidence at trial. The Motion to Bifurcate Consideration of Punitive Damages (Doc. 117) is **DENIED**.

**IT IS SO ORDERED** on this 9th day of September, 2026.

*/s/David Clay Fowlkes*
DAVID CLAY FOWLKES
UNITED STATES DISTRICT JUDGE